## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 12 B 02646 |
| | ) | Chapter 7 |
| KENNETH R. BARRICK., | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |
| | ) | |
| FEDERAL DEPOSIT | ) | |
| INSURANCE CORPORATION, | ) | Adversary No. 12 A 01280 |
| as receiver for the Arcola | ) | |
| Homestead Savings Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH BARRICK, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

The decision in this adversary proceeding turns on the failure of both parties to meet their respective burdens of proof.

In Counts I and II of the complaint, the Plaintiff, Federal Deposit Insurance Corporation, acting as receiver of a failed bank, seeks a finding of nondischargeability under 11 U.S.C. § 523(a)(2)(B) and (a)(4). The Plaintiff argues that the Debtor obtained a loan from the bank by means of a materially false loan application, prepared with the requisite fraudulent intent under § 523(a)(2)(B), and that the Debtor committed larceny in obtaining the funds, prohibited under § 523(a)(4). While conceding that the multi-page loan application contained numerous material inaccuracies, the Debtor counters that he neither prepared nor was aware of the pages containing those inaccuracies, as those pages were prepared and inserted by a dishonest third party to

replace the original, accurate pages that the Debtor signed. The Debtor argues that the Plaintiff has not met its burden of proving that he made any false written statements or possessed the required intent to warrant a finding of nondischargeability under § 523(a)(2)(B) or (a)(4). The Court agrees and finds in favor of the Debtor on Counts I and II.

On the other hand, the parties agree that the Debtor did receive a large loan, the proceeds of which are no longer available to the Debtor's creditors. In Count V, the Plaintiff argues that the Debtor has failed to meet his burden to satisfactorily explain the loss of those assets and should therefore be denied a discharge under 11 U.S.C. § 727(a)(5). The Court agrees and finds for the Plaintiff as to Count V. The Debtor's discharge is therefore denied.

## BACKGROUND

The Debtor is an emergency room physician who agreed to help his mother, Carrole Collins ("Ms. Collins"), and her companion, Constance White ("Ms. White"), obtain a loan to repair the residence on their 130-acre farm property (the "Property") and to provide support for them in their advancing years. The Debtor's assistance was needed because Ms. Collins and Ms. White's financial status rendered them unable to meet standard loan qualifications on their own.

It became apparent from the testimony at trial that, while the Debtor was receptive to entering into new business opportunities to supplement his income as a physician, he did not have the financial or business expertise necessary to achieve those goals on his own. In financial matters, he came to depend on a friend and advisor, Salvatore DiBenedetto ("Mr. DiBenedetto"). It was Mr. DiBenedetto to whom he turned for help in securing a loan for Ms. Collins and Ms. White. Although Mr. DiBenedetto did not testify at trial, he played a central role in this matter, and his business relationship with the Debtor is pertinent to the Court's decision.

In 2007, the Debtor, having completed his residency in Louisiana, moved to Chicago to assume a better-paying position as an emergency-room physician and needed a short-term bridge loan to purchase a home. A mutual acquaintance introduced the Debtor to Mr. DiBenedetto as a possible source for that loan. Mr. DiBenedetto personally loaned the Debtor $90,000, which he shortly thereafter refinanced through a bank loan.

This initial transaction apparently established a level of trust between the Debtor and Mr. DiBendetto that soon developed into a broader business collaboration. Together, over a period of years, the Debtor and Mr. DiBenedetto actively explored business opportunities that included investigating the acquisition of a company called Midwest Open MRI, development of retail health clinics in SuperValu drug stores, and a proposal to Midwest Emergency Associates to provide staffing at the SuperValu healthcare clinics.

By the time that Ms. Collins asked the Debtor if he could recommend someone to assist her in securing financing on the Property, he knew whom to call. (Pretrial Stmt. at p. 5, ¶ 6; p. 6, ¶ 7.) Based upon his prior and continuing involvement with Mr. DiBenedetto in various financial and business matters, the Debtor referred Ms. Collins and Ms. White to Mr. DiBenedetto as someone who would be able to assist them with obtaining a loan. (*Id.* at p. 6, ¶ 7.)

Mr. DiBenedetto told Ms. Collins that because she and Ms. White were not credit-worthy on their own they could not qualify for a loan without a credit-worthy co-signer. (*See id.* at ¶ 9.) At Ms. Collins' request, the Debtor agreed to co-sign for the loan, and Ms. Collins and Ms. White subsequently quitclaimed the Property to themselves and the Debtor. (*Id.* at ¶ 10.)

Mr. DiBenedetto proposed that the Debtor and his co-signers borrow the money (hereinafter, the "Loan") from a bank with which he was affiliated, Arcola Homestead Savings

3

Bank ("Arcola"). Significantly for purposes of this matter, he also proposed that he should manage the Loan proceeds and the investment thereof, promising that the income generated from those investments would accomplish all of Ms. Collins and Ms. White's goals: to enjoy a lifetime monthly stipend of $1,500 to $2,000; maintain and improve the Property; and repay the Loan to Arcola. (*See id.* at ¶ 8.)

The Uniform Residential Loan Application (the "Loan Application") submitted by the Debtor, Ms. Collins, and Ms. White included a listing of the Debtor's assets and liabilities. (Pl. Ex. No. 2.) As described later in the section of this Opinion dealing with § 523(a)(2)(B), the Debtor and Ms. Collins both conceded at trial that the document produced by the Plaintiff at trial as the actual Loan Application upon which Arcola relied contained multiple and significant misstatements about the Debtor's assets. However, they both testified that that Loan Application differed materially from the one they signed, which contained only accurate information. They further noted that the pages of the Loan Application bearing the Debtor's signature (pages three through five) contained accurate financial information, while the pages lacking his signature (pages one and two) were the pages containing significant misstatements.

The Debtor testified that there was never a formal closing for the Loan, neither at the title company nor at a lawyer's office nor at Arcola. Indeed, he testified that he never met with any representative of Arcola other than Mr. DiBenedetto. The Debtor testified without contradiction that Mr. DiBenedetto brought the closing documents to the Debtor's place of work, a busy hospital emergency room. Accompanying Mr. DiBenedetto was his wife, Julia DiBenedetto, who notarized the Debtor's signature on the closing documents. Because the emergency room itself was too public and hectic, the Debtor and the DiBenedettos met in the hospital's "family room," used by physicians and staff to communicate privately with family members of patients.

4

The Debtor credibly testified that he did not review the Loan documents at that time, but simply "signed, signed, signed, signed, signed" the papers quickly so that he could return to his emergency room duties as soon as possible.

For her part, Ms. Collins testified that neither she nor Ms. White attended a formal closing of the Loan. She further testified that the Loan settlement statement bearing her signature and produced by the Plaintiff at trial (the "Settlement Statement") was not the settlement statement she had reviewed and signed in connection with the Loan. (*See* Def. Ex. No. 33.) The Settlement Statement is signed by Ms. Collins, Ms. White, and the Debtor on the third page only. (*Id.*)

Finally, Robert Bingham, an agent of Prism Title, the company that provided the title insurance for the mortgage, testified at trial that he had previously worked with Mr. DiBenedetto on closing approximately five loans from Arcola. According to Mr. Bingham, Mr. DiBenedetto represented himself as an agent of Arcola and was the only person from Arcola with whom Mr. Bingham ever had any interactions. He testified that Mr. DiBenedetto was solely responsible for ordering and handling every aspect of any Arcola transactions. In other words, Arcola essentially closed all of its own loans, without any representative of Prism Title being present at closing. He also testified that he never met the Debtor, Ms. Collins, or Ms. White and that the only person he met in connection with the Loan was Mr. DiBenedetto.

At the time of the Loan, there were two outstanding mortgages on the Property: one to Premier Bank in the approximate amount of $80,000 (the "Premier Mortgage"); and the other to First Community Bank of Galena ("First Community Bank") in the approximate amount of $120,000 (the "First Community Mortgage"). The Settlement Statement only showed a payoff to First Community Bank in the amount of $82,185.31. (Pl. Ex. No. 5.) The Settlement

5

Statement did not reflect a payoff of the Premier Mortgage. (*Id.*) However, despite what was indicated on the Settlement Statement, the Premier Mortgage was paid off; the First Community Mortgage was not.[1]

The Debtor deposited the net proceeds of the Loan, totaling $503,727.18, into an account in his name at Harris Bank. (Pl. Ex. Nos. 5 & 6.) Significantly for purposes of analyzing the § 727(a)(5) claim against the Debtor, the Debtor was the only individual on the account and the only individual with access to a debit card linked to the account.[2] (*See* Pl. Ex. Nos. 7-10.)

The Debtor testified that, other than some small debit card withdrawals for his medical business or personal use, the only transfers from the Harris account were periodic checks or wire transfers to Mr. DiBenedetto[3] for investment and for the care of Ms. Collins. He testified that Mr. DiBenedetto never gave him any documentation to memorialize these account transactions, nor did he receive any statements from Mr. DiBenedetto regarding the investments supposedly made for Ms. Collins. Further details of this testimony are set forth below in the portion of the Opinion dealing with the § 727(a)(5) claim.

Prior to February 17, 2010, Mr. DiBenedetto's company, X-Factor Marketing, made the scheduled Loan payments to Arcola on a regular and timely basis. (*See* Def. Ex. No. 2.) The Debtor and Ms. Collins also testified that Ms. Collins and Ms. White had received monthly stipend payments. Then, on February 17, 2010, Arcola notified the Debtor and Ms. Collins that

---

[1] Although the parties spent a great deal of time at trial establishing that the First Community Mortgage was not paid off at the Loan closing, neither side made arguments on the merits that relied on that non-payment in any way. Because the parties did not appear to consider the mortgage payoffs relevant to the legal issues involved, the Court will devote no further discussion to this issue.

[2] Whatever connections Mr. DiBenedetto had with Arcola, no evidence was introduced at trial suggesting that Mr. DiBenedetto had a similar relationship with Harris Bank or that he had any withdrawal rights in connection with the Debtor's account at Harris Bank.

[3] Technically, these funds were transferred to X-Factor Marketing, an investment company owned and run by Mr. DiBenedetto.

6

Arcola would no longer accept third-party payments on the Loan. (*Id.*) Ms. Collins testified that the monthly stipends stopped some time in 2010.

On June 4, 2010, the Illinois Department of Professional Regulation Division of Banking closed Arcola and appointed the Plaintiff as receiver. (Pretrial Stmt. at p. 5, ¶ 1.) Under 12 U.S.C. § 1821(d)(2)(A), the Plaintiff succeeded to all assets, rights, titles, powers, and privileges of Arcola. (*Id.*)

Mr. DiBenedetto has been indicted, but has not yet been tried on the charges against him alleged in the indictment. Although the record is not clear as to the details, the parties agree that that Mr. DiBenedetto was involved in some sort of allegedly fraudulent activity involving Arcola.

## APPLICABLE STANDARDS

The discharge provided by the Bankruptcy Code is meant to give the honest but unfortunate debtor a financial "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003); *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt under 11 U.S.C. § 523(a) bears the burden of proof. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992). The standard of proof required to establish an exception to the discharge of a debt is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000).

The party objecting to a debtor's discharge has the burden of proving the objection. Fed. R. Bankr. P. 4005; *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983) (noting that "the *ultimate* burden of proof in a proceeding objecting to a discharge lies

with the plaintiff"). Objections to discharge under 11 U.S.C. § 727(a) should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). The objector must establish all required elements of the objection by a preponderance of the evidence. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999).

## DISCUSSION

### 11 U.S.C. § 523(a)(2)(B)

In Count I of the complaint, the Plaintiff alleges that the Loan debt should be found nondischargeable under 11 U.S.C. § 523(a)(2)(B), which provides that:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt–
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
> . . .
>
> (B) use of a statement in writing –
>
> > (i) that is materially false;
> > (ii) respecting the debtor's or an insider's financial condition;
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

To prevail on a claim under § 523(a)(2)(B), a creditor must prove five elements: (1) the debtor made a statement in writing; (2) the statement was materially false; (3) the statement concerned the debtor's financial condition; (4) in making the statement, the debtor had an intent to deceive the creditor; and (5) the creditor actually and reasonably relied upon the statement. *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 507 F.3d 610, 613 (7th Cir. 2007); *In re*

*Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). "[T]he creditor bears the burden to demonstrate by a preponderance of the evidence that the exception applies." *Cohen*, 507 F.3d at 613. The written statement must be "sufficient to determine financial responsibility." *Old Kent Bank-Chi. v. Price (In re Price)*, 123 B.R. 42, 45 (Bankr. N.D. Ill. 1991). Transactional documents that merely imply a certain financial status are not enough. *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 709 (Bankr. N.D. Ill. 2004).

The parties do not dispute: (a) that the Loan Application was in writing; (b) that it contained materially false statements; (c) that the false statements concerned the Debtor's financial condition; and (d) that Arcola relied upon the Loan Application in making the Loan. The materially false statements were exaggerations regarding the Debtor's assets. Specifically, the Debtor testified that his income listed on the Loan Application as $35,000 per month was actually $20,000 to $25,000 per month. He did not have a savings account, stocks, or a retirement fund as reflected on the Loan Application. He did not own a BMW vehicle and did not have personal property valued at $65,000 -- that number too was inflated.

The Debtor's defense is that he did not actually make the false statements, much less do so with the requisite intent to deceive. The Debtor argues that the Loan Application as he originally prepared and submitted it to Arcola, contained no such misstatements, and that Mr. DiBenedetto, without the Debtor's knowledge or consent, substituted the original document with the pages that materially misstated his financial condition.

Significantly, the Debtor's signature appears only on pages three, four, and five of the Loan Application. The first two pages of the Loan Application, which contain the materially false information, do not bear his signature. The Debtor testified that it was his belief that Mr.

DiBenedetto switched the pages of the Loan Application, making the Debtor's financial picture appear rosier than it actually was, so that Arcola would make the Loan.

For her part, Ms. Collins testified that her signature did not appear on the Settlement Statement itself, but only on the third page of a separate "Acknowledgement of Receipt of Settlement Statement." She also testified that the Settlement Statement introduced at trial was not the same settlement statement she had seen in connection with the Loan and was not the one she (and therefore presumably also Ms. White and the Debtor) had signed. (*See* Def. Ex. No. 33.) Ms. Collins' testimony corroborates the Debtor's testimony that the Loan documents were falsified after the originals were signed.

The testimony of the Debtor and Ms. Collins that the Loan documents were altered and falsified, presumably by Mr. DiBenedetto, is further bolstered by the testimony of Prism Title's agent Robert Bingham. His testimony described Mr. DiBenedetto as exercising unfettered control over the Debtor's, Ms. Collins', Ms. White's, and Arcola's dealings with Prism Title. Mr. Bingham testified that he had worked multiple times with Mr. DiBenedetto on Arcola loan closings. At each of those closings, as well as this one, Mr. DiBenedetto was the only person from Arcola with whom Mr. Bingham had any interactions. He also testified that he never met the Debtor, Ms. Collins, or Ms. White and that the only person he did meet with during the entire transaction was Mr. DiBenedetto. Mr. Bingham testified that he did not see the Debtor sign the ALTA policy statement, and that Mr. DiBenedetto was solely responsible for supplying Prism Title with the information required from the borrowers and for delivering the signed Loan documents to Prism Title. The Court finds that his testimony supports a finding that someone other than the Debtor, likely Mr. DiBenedetto, was responsible for the false information in the Loan documents, including the Loan Application and the Settlement Statement.

10

The Plaintiff did not offer testimony from any Arcola representative or from Mr. DiBenedetto to counter the testimony of the Debtor, Ms. Collins, or Mr. Bingham. Instead, it offered only the testimony of Edward Mertic, a representative of the Plaintiff. Mr. Mertic testified that the Loan Application did not contain information typically required in loans of this kind, such as documentation of employment income or tax returns. Mr. Mertic speculated that this Loan likely had a second application, but no such document was introduced into evidence. Nor was any documentation or other evidence offered to refute the evidence offered by the Debtor that the documents submitted to Arcola were not the original documents signed by the Debtor.

It is the Plaintiff's burden to prove the elements of § 523(a)(2)(B). The Debtor and Ms. Collins both testified without contradiction that the Loan Application relied upon by Arcola in making the Loan was not identical to the loan application they had signed. The only contemporaneous documentation – the Loan Application itself – supports their testimony because it contains the Debtor's signature only on the pages containing accurate information. The pages containing admittedly false information do not bear his signature.[4] Finally, Mr. DiBenedetto was the sole point of contact tying together all of the parties in this matter – the Debtor, Ms. Collins, Ms. White, Mr. Bingham, Prism Title, and Arcola. None of the parties ever dealt directly with each other – only with Mr. DiBenedetto, who has since been indicted.

Balanced against this evidence is the total lack of any evidence to contradict the evidence offered by the Debtor. If Arcola representatives, Mr. DiBenedetto, Mrs. DiBenedetto, or some

---

[4] While the notary public's certification on the Loan Application and Loan documents arguably are inconsistent with the testimony of the Debtor and Ms. Collins, the Court has given that fact no weight, because it is Mr. DiBenedetto's wife, Julia DiBenedetto, who served as the notary public for the Loan documentation. She is hardly disinterested, and Mr. DiBenedetto (and therefore, Mrs. DiBenedetto as well) stood to gain from the Loan because the Debtor planned to invest the proceeds with Mr. DiBenedetto. The Court therefore gives no evidentiary weight to the fact that the documents were notarized.

other witness could have contradicted the testimony of the Debtor and Ms. Collins that they did not prepare and were not aware of the materially false portions of the Loan Application, the Court never heard that testimony, as none was offered. The Court therefore finds that the Plaintiff has failed to satisfy its burden of proving that the Debtor caused a materially false writing to be issued with the intent to deceive Arcola and to secure the Loan. The Plaintiff's claim under § 523(a)(2)(B) therefore fails.

## 11 U.S.C. § 523(a)(4)

In Count II of the complaint, the Plaintiff argues that the debt should be found nondischargeable under § 523(a)(4), which lists three grounds for nondischargeability: fraud or defalcation while acting as a fiduciary; embezzlement; and larceny. Here, the Plaintiff alleges larceny.

Larceny is proven for purposes of § 523(a)(4) when a debtor wrongfully takes property from its rightful owner with fraudulent intent to convert such property to his own use without the owner's consent. *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991). Larceny requires a showing of felonious intent at the time of the taking. *Iwaszczenko v. Neale (In re Neale)*, 440 B.R. 510, 520 (Bankr. W.D. Wis. 2010). "Intent may properly be inferred from the totality of the circumstances and the conduct of the person accused." *Rose*, 934 F.2d at 904. In order to prevail under its § 523(a)(4) claim, the Plaintiff must prove that the Debtor possessed the requisite felonious intent at the time he applied for the Loan. As discussed below, the Court finds that the Plaintiff has not met that burden here.

At trial, the Debtor testified that he believed the purpose of the Loan was to provide financial assistance to Ms. Collins and Ms. White. To accomplish this, the Debtor obtained the Loan, believing it would be in the form of a reverse mortgage. The Debtor further testified that it

12

was his intent that the proceeds of the Loan would be used in part for investment in Mr. DiBenedetto's business, X-Factor Marketing, and that the combined Loan and investment proceeds would: (1) pay off the prior mortgages on the Property; (2) pay the mortgage to Arcola; (3) provide a monthly stipend to Ms. Collins and Ms. White for their personal use; and (4) provide funds for maintenance and improvements on the Property.

The Court finds that the Plaintiff has failed to meet its burden of establishing that the Debtor possessed the requisite felonious intent. Specifically, the Court finds credible the Debtor's testimony that he intended that the Loan proceeds be used to provide for Ms. Collins and Ms. White. His testimony was corroborated by that of Ms. Collins that she implored the Debtor to help her and Ms. White with their financial difficulties and that the Loan co-signed by the Debtor was the result of that plea. She further testified that the Debtor introduced her to Mr. DiBenedetto, who explained to her what refinancing her outstanding debt would accomplish. Her understanding was that the purpose of the Loan was to pay off the prior mortgages and then secure a reverse mortgage to provide a monthly stipend in the amount of $1,500 to $2,000. The testimony of the Debtor and Ms. Collins is also corroborated by the fact that Ms. Collins and Ms. White received monthly stipend payments, and that X-Factor Marketing did in fact make payments on the Loan from approximately July 2008 until February 2010, when Arcola informed the Debtor and Ms. Collins that it would no longer accept Loan payments from third parties.

The Plaintiff offered no testimony contradicting or negating any of this evidence regarding the Debtor's intent at the time the Loan was made. Thus, the Plaintiff failed to establish that Debtor acted with the requisite felonious intent at the time the Loan was made. The Court therefore finds that the Plaintiff has failed to meet its burden to prove that the Debtor committed larceny under § 523(a)(4).

**11 U.S.C. § 727(a)(5)**

In Count V of the complaint, the Plaintiff contends that the Debtor has failed to satisfactorily explain a loss or dissipation of assets and should therefore be denied his discharge under 11 U.S.C. § 727(a)(5), which provides:

> (a) The court shall grant the debtor a discharge, unless—
>
> . . .
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(5). Under this section, a bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Martin*, 698 F.2d at 886.

The creditor has the initial burden "of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors." *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005). Once the creditor has met this initial burden, the burden shifts to the debtor to satisfactorily explain the loss. *Id.* The determination of what constitutes a "satisfactory" explanation is left to the discretion of the court. *Nuvell Credit Corp. v. Ross (In re Ross)*, 359 B.R. 690, 700 (Bankr. N.D. Ill. 2007).

Although the debtor's explanation need not be comprehensive, it must meet two criteria to be deemed "satisfactory." *Saluja v. Mantra (In re Mantra)*, 314 B.R. 723, 730 (Bankr. N.D. Ill. 2004). First, it must be supported by at least some documentation. *Id.* Second, this documentation must be sufficient to eliminate the need for the court to speculate as to what happened to all of the assets. *Id.* "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 999 (Bankr. N.D. Ill. 1992).

The parties do not dispute that on July 23, 2008, the Debtor deposited the net proceeds of the Loan, in the amount of $503,727.18, into his account at Harris Bank. (*See* Def. Ex. No. 3.) At trial, the Debtor testified that he was the sole owner of the account and possessed its only debit card.

The following table summarizes the activity in the Debtor's Harris Bank account from the date of his initial deposit of the Loan proceeds in July 2008 until October 7, 2009.[5]

| STATEMENT PERIOD ENDING | BEGINNING BALANCE | ENDING BALANCE |
|---|---|---|
| August 8, 2008 | $518,727.18[6] | $144,117.15 |
| September 5, 2008 | $144,117.15 | $47,778.36 |
| October 7, 2008 | $47,778.36 | $7,373.36 |
| November 6, 2008 | $7,373.36 | $6,105.25 |
| December 4, 2008 | $6,105.25 | $5,921.14 |
| January 8, 2009 | $5,921.14 | $300,149.98[7] |
| February 5, 2009 | $300,149.98 | $153,130.81 |
| March 5, 2009 | $153,130.81 | $48,253.52 |
| April 7, 2009 | $48,253.52 | $10,536.37 |
| May 6, 2009 | $10,536.37 | $3,543.89 |
| June 4, 2009 | $3,543.89 | $1,628.38 |
| July 7, 2009 | $1,628.38 | $9,456.69 |
| August 6, 2009 | $9,456.69 | $24.46 |
| September 8, 2009 | $24.46 | ($45.54) |
| October 7, 2009 | ($45.54) | $485.00 |

(*Id.*)

---

[5] The Court uses the October 7, 2009 statement date as the final date because after that date, there were no significant transactions in the account. The last account deposit, according to the account statements admitted into evidence, took place on October 1, 2009 in the amount of $500. Other than a monthly $15.00 "maintenance fee," there were no other account transactions after that date. (Def. Ex. No. 3.)

[6] as of July 23, 2008

[7] As shown on the January 8, 2009 statement, there was a deposit of $497,245.15 made on December 16, 2008 (the "Vann Check"), which increased the account balance in December 2008. The Vann Check was allegedly provided by Mr. DiBenedetto and apparently came from funds supplied by another investment client of Mr. DiBenedetto, Thomas Vann. The balance in the Harris Bank account after the Vann Check was deposited was reduced to $300,149.98 by January 8, 2009. Despite the two large deposits of $503,727.18 in July 2008 and $497,245.15 in December 2008, respectively, the account balance was down to $24.46 by August 6, 2009.

These account statements evidence a net diminution of over $500,000 in the value of the Harris Bank account over the course of just thirteen months. The Court therefore finds that the Plaintiff has met its initial burden of establishing that the Debtor at one time owned substantial and identifiable assets no longer available to his creditors. The burden now shifts to the Debtor to explain the loss or dissipation of those assets.

At trial, the Debtor admitted that he made a number of withdrawals and transfers from the Harris Bank account, even though the purpose of the Loan had been to provide for Ms. Collins and Ms. White. For example, the Debtor testified that several debit card point of service purchases (for instance, a computer) were for personal use or for his medical practice.[8] (*Id.*) According to the Debtor, those withdrawals and transfers totaled approximately $22,000 and included debit card purchases which were neither for the care of Ms. Collins nor for payments on the Loan. The Debtor testified that this $22,000 was the only amount that he spent on himself or his medical practice. The Court finds his testimony to be a credible and satisfactory explanation of the dissipation of approximately $22,000 of the Loan funds.

Further, according to the Debtor's testimony, he was responsible for transfers of $310,000 from the Harris account to Mr. DiBenedetto for investments:

- July 23, 2008 debit of $50,000;
- July 30, 2008 check for $100,000;
- August 13, 2008 debit of $45,000;
- September 4, 2008 debit for $45,000;

---

[8] The Debtor also testified that there was a $15,000 deposit made on August 6, 2008 by Mr. DiBenedetto for the Debtor's use in order to offset his decreased income resulting from time spent on their proposed business ventures. (*See* Pl. Ex. No. 6; Def. Ex. No. 3.) The Debtor admitted that he spent more than the $15,000, and that the total he spent was approximately $22,000.

- October 3, 2008 debit of $30,000; and

- February 25, 2009 debit of $40,000

(*See* Def. Ex. No. 3.)

Unfortunately for the Debtor, his testimony alone is insufficient to constitute a satisfactory explanation for purposes of § 727(a)(5). To meet the requirements of that statute, his oral testimony must be corroborated by some written documentation. *See Mantra*, 314 B.R. at 730. The Debtor failed to offer any supporting documentation. On the contrary, his testimony emphasized the non-existence of the necessary proof, because he declared that he never received any investment statements from Mr. DiBenedetto, so that he had no idea how the funds were being invested or, indeed, whether Mr. DiBenedetto actually invested them at all. In the absence of any supporting documentation, the Court finds the explanation that the money was used by Mr. DiBenedetto for "investment," is not a satisfactory explanation for the loss or dissipation of those assets.

In addition to this deficiency in the Debtor's proof, the Debtor could not offer even a credible oral explanation for a number of other large withdrawals from the Harris Bank account that the Debtor claims he did not initiate and for which he was not responsible. Those withdrawals are listed in the table below:

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| July 23, 2008 | Debit Memo | $50,000 |
| July 24, 2008 | Debit Memo | $152,450 |
| September 4, 2008 | Debit Memo | $50,000 |
| January 15, 2009 | Debit Memo | $60,000 |
| January 30, 2009 | Debit Memo | $80,000 |
| February 6, 2009 | Debit Memo | $50,000 |
| March 4, 2009 | Debit Memo | $1,000 |
| March 10, 2009 | Debit Memo | $35,000 |
| March 10, 2009 | Debit Memo | $35,000 |

(*See* Def. Ex. No. 3.)

With respect to these debits, the account statements in evidence include copies of the "Debit Advice" slips. (*Id.*) The Debtor testified that while some of these slips bore his genuine signature, others were forgeries. (*Id.*) However, because it was his practice never to review any of the account statements he received from Harris Bank,[9] he did not discover these discrepancies for many months.

The Debtor's sole explanation for the withdrawals and transfers is that the money must have been "stolen." Given that the Debtor also testified that he was the sole signatory on the account, the sole person authorized to make withdrawals from it, and holder of the lone debit card for the account, his "theft" theory warrants some fleshing out, to say the least. Alas, the Debtor did not share with the Court the clues that led to his detection of this "crime" or his list of suspects.

---

[9] With respect to the Vann Check, the Debtor testified that he suspected that Mr. DiBenedetto had made the deposit into the account, and that it was not the Debtor's handwriting on the endorsement of the Vann Check. (Def. Ex. No. 9.) He stated that he did not deposit the Vann Check into his account, and did not learn of the Vann Check until February 2009. In addition, at the time of the Vann Check deposit, the account had been depleted to approximately $5,900. The Vann Check in the approximate amount of $497,000 took the balance back up to around $503,000, the approximate amount of the Loan proceeds. According to the Debtor, had he known about the deposit at the time, he would not have thought it was unusual because there was money going in and out of the account for the investments by Mr. DiBenedetto. Nevertheless, the Debtor offered no additional or differing explanation for the dissipation of the funds derived from the Vann Check.

The Court also notes that the Debtor's explanation that the funds were stolen from the account is undermined by his odd reaction to finding himself to be the victim of an alleged crime. He admitted that he never filed a police report, notified any authority, made an insurance claim, or claimed theft losses on his income tax returns. What did he do instead? He hired a criminal defense attorney. None of this helps the Debtor's already dubious "theft" theory.

In short, the Court finds that the Debtor's explanation for the loss of assets as "stolen" fails to meet the test to be deemed satisfactory. Without any corroborating evidence or supporting documentation, the Court, in the exercise of its discretion, finds that the Debtor has failed to meet his burden to satisfactorily explain the loss of assets as required by § 727(a)(5). Thus, the Court finds in favor of the Plaintiff on Count V of the complaint and denies the Debtor's discharge under § 727(a)(5).

## CONCLUSION

For these reasons, the Court finds that the Plaintiff has failed to meet its burden to establish nondischargeability of the debt under § 523(a)(2)(B) and (a)(4) and finds in favor of the Debtor on Counts II and III of the complaint. The Court finds in favor of the Plaintiff on Count V of the complaint, and denies the Debtor's discharge under § 727(a)(5).

**ENTERED:**

DATE: Sept. 24, 2014

Donald R. Cassling
**Donald R. Cassling**
**United States Bankruptcy Judge**